**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**PATRICIA J. WHITE,**

        **Plaintiff,**

  v.                                  **Civil Action 2:19-cv-3982
                                    Judge Michael H. Watson
                                    Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Patricia J. White, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's non-disability finding and **REMAND** this case to the Commissioner and Administrative Law Judge under Sentence Four of § 405(g).

**I.  BACKGROUND**

Plaintiff filed her applications for DIB and SSI in March 2012, alleging that she was disabled beginning June 1, 2001. (Tr. 313–27). After her application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing on May 27, 2014. (Tr. 98–122). On June 24, 2014, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 77–97).

The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–6). Plaintiff then filed a case in this Court. (*See* Southern District of Ohio, 2:15-cv-3055). On June 28, 2016, Judge George C. Smith accepted a

joint motion to remand the case back to the administrative level. (Tr. 1749).

A second administrative hearing was held on November 13, 2017, (Tr. 1675–1722), and a third hearing was held on June 21, 2018, (Tr. 1655–1674). On August 3, 2018, the ALJ issued an unfavorable decision. (Tr. 1615–1654).

In lieu of appealing to the Appeals Council, Plaintiff filed the instant case on September 10, 2019 (Doc. 1). This matter is now ripe for resolution. (*See* Docs. 6, 9, 10, 11).

**A. Relevant Medical Evidence**

Because Plaintiff's Statement of Errors pertains only to her vision issues, the Undersigned limits her discussion to the same. In July 2001, Plaintiff developed blurred vision in her right eye, which affected her central vision and resulted in discomfort with eye movements. (*See* Tr. 525–26). She was referred to neuro-ophthalmologist Dr. Steven Katz, who examined Plaintiff on August 11, 2001. (Tr. 485–87). He noted that Plaintiff had signs of lymphadenopathy on her imaging studies, which were suggestive of sarcoidosis. (Tr. 488). Dr. Katz also noted that Plaintiff's visual acuity was significantly diminished in her right eye but that she retained 20/20 vision in her left eye. (*Id.*). He noted that her work-up was unremarkable for infectious or inflammatory conditions that were typically associated with this disorder and found it was likely that Plaintiff had the coexisting autoimmune disorder of sarcoidosis. (*Id.*). He administered a Kenalog injection to treat her neuroretinitis condition on August 21, 2001. (Tr. 486–87). And mediastinoscopy results, dated November 8, 2001, confirmed the diagnosis of pulmonary sarcoidosis. (Tr. 520–21).

In a May 2003 correspondence, Dr. Katz summarized his treatment history and clinical findings in Plaintiff's case. (Tr. 611–613). He noted that Plaintiff was diagnosed with neuroretinitis of the right eye with some optic atrophy despite injections. (*Id.*). At that time, vision

2

testing showed that she was essentially blind in the right eye with no more than light perception. (*Id.*). It appears from the record that, over the next eight or nine years, Plaintiff did not regularly receive treatment for her vision problems.

In July 2012, neurologist Dr. David Arnold evaluated Plaintiff's neuromuscular symptoms. (Tr. 1256–57). At that time, her right eye ptosis issues were attributed to ocular myasthenia rather than sarcoidosis. (*Id.*). She underwent single fiber electromyelogram nerve conduction studies, which did not reveal any neuromuscular transmission defect. (*Id.*). Dr. Arnold then ordered updated laboratory studies to determine if myasthenia gravis should be treated with immune-modulating agents. (*Id.*).

On November 21, 2012, Drs. E. Bakri and R. Panara performed a consultative neuromuscular evaluation of Plaintiff regarding her ocular myasthenia condition. (Tr. 1450–52). Plaintiff reported that she had experienced ptosis and double vision in the past that had improved over time and that she no longer required treatment for persistent ocular symptoms. (*Id.*). She reported, however, that she experiences problems with ptosis, light sensitivity, and eye pain when she works too long at the computer or watches television for a long time. (*Id.*).

Records from August 2014 note Plaintiff's complaints of problems with ptosis, cluster headaches, unilateral eye pain, and lacrimation. (Tr. 2624). On November 8, 2016, Dr. Nicholas Rogers performed a consultative vision examination. (Tr. 3165–66). Test results revealed that Plaintiff's best-corrected vision in her left eye was 20/20. (Tr. 3165). But she still had significant right-eye vision deficits. (Tr. 3165–66). On November 18, 2016, Dr. David Hirsh also performed an ophthalmological evaluation. (Tr. 3305–09). Plaintiff told Dr. Hirsh that she was concerned about her vision in her left eye, which she reported had begun to decline over the last six to eight

3

months. (Tr. 3307). Dr. Hirsh's diagnostic impression was nonarthritic anterior ischemic optic neuropathy. (Tr. 3309.).

### B. The ALJ's Decision

In his decision, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2007, (Tr. 1621), and had not engaged in substantial gainful activity since July 15, 2001, the alleged onset date, (*id.*). He found that Plaintiff suffers from the following severe impairments: right sided neuroretinitis; myasthenia gravis; sarcoidosis; degenerative disc disease of the lumbar spine; fibromyalgia; neuropathy; obesity; and Grave's Disease. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 1623).

As for Plaintiff's residual functional capacity ("RFC"), the ALJ concluded:

> [T]he claimant has the residual functional capacity to perform a limited range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant's ability to perform the full range of light work is compromised by postural limitations that preclude her from climbing ladders/ropes/scaffolds and restrict her to occasional kneeling, crouching, crawling and climbing of ramps/stairs. The claimant is also restricted to climbing stairs/ramps that have a handrail for support. Ms. White retains the ability to perform stooping activities on a frequent basis during an eight-hour workday. From an environmental perspective, the claimant must avoid concentrated exposure to pulmonary irritants such as fumes, odors, dust, and gases. She should also avoid dangerous hazards such as unprotected heights and/or moving machinery. Secondary to vision impairment, and her susceptibility to eyestrain, the claimant is precluded from working in a job that requires looking at a computer screen. The claimant is limited to jobs that require no more than occasional exposure to direct sunlight or bright florescent lighting (brighter than the average office environment) during an eight-hour workday. In addition, Ms. White should be allowed to wear sunglasses as needed. The claimant is also limited to occasional tasks that require depth perception and/or reading. With regard to reading, she is not able to read any written materials with font size that is smaller than regular newsprint. Moreover, the claimant requires the ability to alternate between tasks that require near acuity vision and tasks that do not require near acuity skills during a typical eight-hour workday. More specifically, the claimant is able to perform near acuity tasks for no more than thirty minutes at one time before she requires a five-minute break. During the five-minute interval (or longer interval), she is able to perform tasks that do not require near acuity skills before

4

>she is able to resume performing near acuity vision tasks for anther period of thirty minutes.

(*Id*.).

As for the relevant opinion evidence, the ALJ turned first to the opinion of Dr. Katz, who opined that Plaintiff has to take intermittent breaks when performing vision-related tasks that require near vision due to vision asthenopia and that she has difficulty with prolonged reading and computer work due to vision impairment. (Tr. 1635). The ALJ assigned Dr. Katz's opinion partial weight and incorporated the suggested restrictions into the RFC. (*Id*.). Next, the ALJ assigned partial weight to the physical residual functional assessments of the DDS medical consultants, who opined that Plaintiff has visual limitations, namely an inability to perform work requiring good binocular vision or depth perception. (*Id*.) The ALJ agreed with their assessments "[e]xcept for expanded visual limitations and a few other nonexertional limitations." (*Id*.).

The ALJ then considered the opinion of Dr. Bill Gegas, who opined that Plaintiff is unable to work in front of a computer monitor or bright fluorescent light for prolonged periods and that she is limited to part-time work for two to four hours because she cannot focus or use her eyes for prolonged periods. (Tr. 1636). The ALJ adopted the computer monitor and lighting restrictions but noted that the limitation to part-time work "appear[ed] to be related only to her past position as a desk help analysis." (*Id*.). Next, the ALJ considered the opinion of Dr. Robert Wyatt, who opined that Plaintiff will have difficulty performing computer work due to her right sided vision impairment. (*Id*.). The ALJ stated that he "carefully considered Dr. Wyatt's opinion statements and [ ] adopted them as appropriate when making the residual functional capacity limitations regarding the claimant's vision limitations and residual functional capacity in general." (*Id*.).

Next, the ALJ considered the opinion of Dr. Frank Read, an ophthalmologist who reviewed Plaintiff's medical records and opined, in September 2003, that Plaintiff had few if any work

5

limitations due to her monocular vision apart from possibly activities requiring fine depth perception. (*Id.*). The ALJ rejected Dr. Read's opinion:

> The opinions from treating doctors Drs. Katz, Gegas and Wyatt contradict Dr. Read's opinion and these other medical opinions are more consistent with the evidence as a whole. Moreover, Dr. Read did not consider the claimant's intermittent problems with eye pain and/or eye strain with prolonged near acuity vision tasks when he concluded that she would not have difficulty performing her past job as a help desk analysis [sic]. Dr. Read did not have the benefit of examining the claimant in person and his opinion is not entitled to more than little weight.

(Tr. 1637).

The ALJ also assigned little weight to the opinion of Dr. Rogers, who performed a consultative ophthalmologic evaluation of Plaintiff on November 8, 2016, and diagnosed her with diffuse severe optic atrophy in the right eye and mild symptoms in the left eye but did not provide any exertional limitations, noting that such limitations are not applicable to vision deficits. (*Id.*). The ALJ explained:

> The undersigned finds that Dr. Rogers overestimated the claimant's ability to perform vision-related tasks. Although he was able to physically examine the claimant on one occasion, the opinion evidence from the claimant's treating physicians warrants greater weight. After careful consideration of the entire record, the undersigned credits Dr. Rogers' finding that the claimant's vision impairment does not result in exertional limitations, but rejects his assessment of very few nonexertional limitations. Indeed, the other evidence demonstrates that the claimant does not have the residual functional capacity to perform the vision-related tasks of work that requires using a computer display screen, and/or more than occasional reading of materials with ordinary newsprint font. The claimant is precluded from using a computer or reading very small print and it is necessary for her to take breaks during the day when performing sustained near vision tasks for more than thirty minutes at one time.

(*Id.*).

Finally, the ALJ considered Dr. Jeffrey Horwitz's opinion from his hearing testimony and written responses to interrogatories. (*Id.*). The ALJ assigned his opinions significant weight, explaining that they are "generally consistent with the other evidence of record." (*Id.*).

6

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

Plaintiff's argument is narrow. She asserts that the ALJ should not have relied on the testimony of the Vocational Expert ("VE") Connie O'Brien to conclude, at step five of the analysis, that there was other work within the national economy that Plaintiff could perform. (Doc. 9 at 7–12). The Undersigned agrees.

At Step Five of an ALJ's sequential analysis, the ALJ determines whether the claimant, based on the claimant's residual functional capacity and vocational factors (such as age, education, and work experience), can "make an adjustment to other work." 20 C.F.R. § 404.1520(g)(1).

7

Although the claimant "bears the burden of proof during the first four steps, . . . the burden then shifts to the Commissioner at [S]tep [F]ive." *Staymate v. Comm'r of Soc. Sec.*, 681 F. App'x 462, 469 (6th Cir. 2017) (quotation marks and citations omitted omitted). To satisfy that burden, "the Commissioner must identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile." *Id*. (quotation marks and citation omitted omitted). In doing so, the ALJ may "take administrative notice of reliable job information available from various governmental and other publications." 20 C.F.R. § 404.1566(d). The Dictionary of Occupational Titles ("DOT") "is one such publication upon which an ALJ may rely." *Springer v. Comm'r of Soc. Sec.*, No. 18-CV-12705, 2020 WL 1531757, at *16 (E.D. Mich. Mar. 31, 2020) (citation omitted). "The ALJ may also seek the views of [a VE], who may present evidence that includes information from outside the DOT, including other reliable publications, information obtained directly from employers, or from a VE's . . . experience in job placement or career counseling." *Id*. (quotation marks and citations omitted).

Where an ALJ relies solely on a VE's hearing testimony, as the ALJ did in this case, (*see* Tr. 1639), the Court must decide whether substantial evidence supports the ALJ's decision to do so. *See id*. (citation omitted) (noting that, whether the ALJ's decision to rely on the VE's testimony is supported by substantial evidence is decided on a case-by-case basis considering, as a whole, the VE's testimony and the administrative record). At base, the Court must be able to engage in a "meaningful review" of the ALJ's decision. *Moyers v. Colvin*, No. 3:13-0959, 2015 WL 1013992, at *21 (M.D. Tenn. Mar. 9, 2015*), report and recommendation adopted*, No. 3:13-CV-0959, 2015 WL 1467178 (M.D. Tenn. Mar. 30, 2015).

Relevant here, "substantial evidence does not support an ALJ's decision to deny disability benefits where the VE's testimony was unclear." *Zerby v. Comm'r of Soc. Sec. Admin.*, No.

8

1:13CV1405, 2014 WL 3956778, at *6 (N.D. Ohio Aug. 13, 2014) (citations omitted); *see also Springer*, 2020 WL 1531757, at *19 ("Without such a bridge or other explanation by the ALJ concerning why she found the VE's experience-based opinion concerning the number of jobs to be reliable, this Court cannot meaningfully review the ALJ's finding of reliability."); *Moyers*, 2015 WL 1013992, at *21 (remanding where the VE's testimony was "unacceptably vague" prohibiting "meaningful review of the Commissioner's decision"). That is what happened here.

As noted, the ALJ incorporated a number of vision restrictions into Plaintiff's RFC, including that she "is precluded from working in a job that requires looking at a computer screen," "is limited to jobs that require no more than occasional exposure to direct sunlight or bright florescent lighting (brighter than the average office environment) during an eight-hour workday," "should be allowed to wear sunglasses as needed," "is [] limited to occasional tasks that require depth perception and/or reading," "is not able to read any written materials with font size that is smaller than regular newsprint," must be able to "alternate between tasks that require near acuity vision and tasks that do not require near acuity skills during a typical eight-hour workday," "is able to perform near acuity tasks for more than thirty minutes at one time before she requires a five-minute break," and finally, that, "[d]uring the five-minute interval (or longer interval), she is able to perform tasks that do not require near acuity skills before she is able to resume performing near acuity vision tasks for another period of thirty minutes." (Tr. 1623).

So at the hearing, the ALJ posed hypotheticals for the VE that incorporated these restrictions. (Tr. 1664–1669). The VE testified that Plaintiff could perform three jobs—a housekeeper (15,000 jobs nationally), a photocopy machine operator (52,000 jobs nationally), and a garment bagger (63,000 jobs nationally). (Tr. 1666–67). Plaintiff's attorney wanted to ensure that each of these three jobs could be performed under the ALJ's specific lighting restrictions. (Tr.

9

1668).  Accordingly, she asked the VE to explain "what kind of lighting is available in [those] jobs[.]" (*Id.*).  But the VE could not provide a straight answer.  She responded:

> Not particularly, I mean, in housekeeping it's typically house lighting.  I mean, you're in more like hotels and that sort of thing.  But, no, I cannot with any accuracy describe the lighting in a variety of workplaces.

(*Id.*).  Plaintiff's attorney pressed a bit more:

> Q. So, you're not sure whether, you know, someone, the photocopy machine operator, those jobs that you named, could be in places that have - -
>
> A. Yes, they could be.
>
> Q. - - fluorescent lighting.  So that's - -
>
> A. Yeah, so part of the hypothetical is that the individual had to be able to wear sunglasses, so I don't know are those two things related?
>
> ALJ: Well, I believe it was based on her testimony from the last hearing that she - - she needs to - -
>
> VE: So, no, I cannot speak to the lighting - -
>
> ALJ: - - she generally needs to wear - -
>
> VE: - - in individual workplaces, either in an industry or like - - or an individual setting.

(Tr. 1668–69).

Plaintiff's attorney tried, yet again, to flush out whether there is a significant number of any of the three jobs identified by the VE that could be performed under the ALJ's lighting restrictions:

> Q. So, if an individual could not be in a position with fluorescent lighting, you wouldn't be able to testify to the number of jobs that would be available in that situation?
>
> A. I can tell you, like I just did with housekeeper, that there would be work not in fluorescent lighting.  However, photocopy machine operator would be in a business setting, and there could be fluorescent lighting.  Lighting's undergoing tremendous amounts of changes in the workplace due to the cost of lighting and energy

10

efficiency, so everyone's changing over to the type of lighting that they're using. So, I can say that there would be work available, but I can't speak to the percentage based on the type of lighting.

(Tr. 1069).

The ALJ then asked a similar question:

Q. Would you be able - - you testified to that in your experiencing housekeeping generally doesn't involve fluorescent lighting. Are you able to give another example of an occupation that fits the rest of the parameters that, you know, in your experience?

A. Well, all of them. All the examples provided - -

Q. Okay.

A. - - that are not in fluorescent lighting.

Q. Okay.

A. Especially as they switch over to non-fluorescent lighting, I mean, that's - - that's an old technology that's being eliminated.

ATTY: What if it's not a matter of the fluorescent itself, but a matter of bright lighting?

ALJ: Oh, we covered that.

VE: Yeah, it fits with - - my testimony fits within the - - yeah.

ALJ: That is addressed in the hypothetical.

VE: It's that office lighting.

ALJ: No brighter than the standard office environment.

ATTY: Okay, but I just wanted to make sure that that - -

VE: Yes.

ALJ: Yep.

ATTY: - - was also, because I know there were some difficulty with getting the whole hypothetical down.

11

(Tr. 1670–71).

> But Plaintiff's attorney was not convinced:
>
> Q. So, all of those jobs, still even if they're not fluorescent, you're saying is still less office lighting or less, in terms of brightness.
>
> A. Yeah, it fits within the elements of the hypothetical.
>
> Q. And, where are those categories, I guess, because I know the DOT and the SCO doesn't really address lighting?
>
> A. So, oh, what's your question?
>
> Q. Well, how are you finding those jobs . . .

(Tr. 1671).

> The ALJ wanted to know, too:
>
> ALJ: What is your answer that those jobs can be performed and do not require - - are not in an environment with brighter than office lighting based on? Is that what you're - -
>
> BY ATTORNEY:
>
> Q. Yes, because the DOT and the SCO, I know, do not address lighting.
>
> A. So, based on my experience.
>
> Q. That there's no - -
>
> A. And the descriptions of the jobs. So, I mean, you know, based on my experience as a vocational rehabilitation professional.

(*Id.*).

> But just as Plaintiff began to probe the VE's experience, the VE backpedaled a bit:
>
> Q. And, so have you seen the garment bagger position performed?
>
> A. I have seen, I mean, garment bagger positions are typically performed in warehouses and drycleaners, laundries, so yes. I mean, yes, I know what the job is. You know, I'm not going to be able to answer specific questions about the lighting, so.
>
> ATTY: Well, then, that's kind of my point and on this case is does come down to

12

> lighting and visual issues and those aren't addressed in the DOT. They're not addressed in the SCO and right now we've got testimony that these jobs exist, but we don't know the numbers. We don't know what particularly could happen in terms of the number of jobs or whether those jobs are available. And, so that, you know, I think you and I discussed before, this is a very complicated case. It's not a typical, standard case because it does come down to these issues and when the DOT and SCO don't address the lighting, you know, just experience without something more specific to back it up, it's kind of hard to accept that without other documentation in terms of studies or testing, you know, to go with that.
>
> ALJ: I understand your point. Any other follow-up?
>
> ATTY: No, not with the vocational expert, Your Honor.

(Tr. 1671–72).

Plaintiff, in her Statement of Errors, asserts that the ALJ erred in relying on the VE's testimony to conclude that there is a significant number of jobs in the national economy that she could perform. (*See generally* Doc. 9). Notably, Defendant acknowledges, in response, that "there might have been a question as to whether Plaintiff could perform" the occupations of garment bagger and photocopy machine worker. (Doc. 10 at 1). But, according to Defendant, "it is unquestionable" that Plaintiff could perform the job of housekeeper, so the ALJ met his burden at Step Five. (*See id.*).

There are two critical problems with Defendant's argument. To begin, the VE's testimony regarding whether Plaintiff can perform the job of housekeeper is not, as Defendant asserts, "unquestionable" (*id.* at 1) or "unambiguous" (*id.* at 8). As noted, the VE said the following about the housekeeping job:

> . . . I mean, in housekeeping it's typically house lighting. I mean, you're in more like hotels and that sort of thing. But, no, I cannot with any accuracy describe the lighting in a variety of workplaces.

(Tr. 1668). The above testimony does not establish with certainty that there is a significant number of housekeeping jobs in the national economy that could be performed under the ALJ's lighting

13

restrictions.

More importantly, in his written opinion, the ALJ does not find that Plaintiff can perform only the housekeeping job. Nor does he address the inconsistencies in the VE's testimony. Rather, he concludes, based on the VE's testimony alone, that she can perform all three jobs. (*See* Tr. 1639). Without clear testimony from the VE or an explanation from the ALJ of why he accepted the VE's testimony at face value, the Undersigned cannot perform a "meaningful review" of the ALJ's decision. *Moyers*, 2015 WL 1013992, at *21 (remanding where VE's testimony was "unacceptably vague" prohibiting "meaningful review of the Commissioner's decision); *see also Springer*, 2020 WL 1531757, at *19 ("Without such a bridge or other explanation by the ALJ concerning why she found the VE's experience-based opinion concerning the number of jobs to be reliable, this Court cannot meaningfully review the ALJ's finding of reliability."); *Woodruff v. Astrue*, No. 1:12-CV-1752, 2013 WL 821336, at *7 (N.D. Ohio Mar. 5, 2013) ("The VE's testimony on cross-examination revealed multiple bases that could call into question the reliability of his opinion regarding the number of positions for each occupation that he identified. Given that substantial evidence does not support the ALJ's stated reasons for accepting that testimony as reliable, the Plaintiff is entitled to remand on this issue so that the ALJ can consider further evidence and/or clarify the bases for the VE's testimony.")

Accordingly, a limited remand is necessary for the narrow purpose of conducting another Step Five analysis to assess which, if any, of the three jobs can be performed under the various lighting restrictions set forth in the ALJ's RFC. *See, e.g.*, *Springer*, 2020 WL 1531757, at *19 (ordering remand for the limited purpose of conducting another Step Five analysis); *Woodruff* 2013 WL 821336, at *7 (same).

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's non-disability finding and **REMAND** this case to the Commissioner and Administrative Law Judge under Sentence Four of § 405(g).

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

    IT IS SO ORDERED.


Date:  April 20, 2020                                     /s/ Kimberly A. Jolson
                                                                     KIMBERLY A. JOLSON
                                                                     UNITED STATES MAGISTRATE JUDGE